IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

WESELY WILLIAMS,

                    Plaintiff,

                                                Civ. Action No.
        v.                                      9:09-CV-0643 (DNH/DEP)

MARY BAILEY and LORI MARDON,

                    Defendants.

_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

WESELY WILLIAMS, *Pro Se*
05-A-1183
Orleans Correctional Facility
3531 Gaines Basin Road
Albion, NY 14411

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN          ADRIENNE J. KERWIN, ESQ.
Attorney General of                Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

*Pro se* plaintiff Wesely Williams, a New York State prison inmate, commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights.  While the claims originally contained within his complaint were considerably broader and the number of defendants named was greater, as a result of prior motion practice plaintiff's claims have been narrowed significantly and now involve only those asserted against a supervising corrections counselor and an education counselor employed at the facility in which he was incarcerated at the relevant times. Plaintiff alleges that those two defendants deprived him of certain programming and activities available to other inmates, and contends that he was thereby deprived of equal protection as guaranteed under the Fourteenth Amendment to the United States Constitution.

Currently pending before the court is a motion for summary judgment filed by the remaining two defendants seeking dismissal of plaintiff's remaining claims against them.  In their motion, defendants argue that plaintiff is procedurally barred from pursuing the claims in this action based upon his failure to exhaust available administrative remedies before commencing suit, and that, in any event, plaintiff's claims are without merit.  For the reasons set forth below, I recommend that

2

defendants' motion be granted.

I.      BACKGROUND[1]

Plaintiff is an inmate entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS").  *See generally* Amended Complaint (Dkt. No. 5); Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 41-6) ¶ 1.[2]  Plaintiff was transferred by the DOCCS into the Coxsackie Correctional Facility ("Coxsackie"), located in Coxsackie, New York, on October 15, 2008 and remained there at the times relevant to his claims in the action.  Amended Complaint (Dkt. No. 5) ¶ 1; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 41-6) ¶ 1.

Plaintiff's claims stem from his disagreement with programming offered to him while at Coxsackie.  Program placements at that facility are made by a Program Committee.  Mardon Decl. (Dkt. No. 41-5) ¶ 3. Defendant Lori Mardon, an educational counselor at Coxsackie,

---

[1]      In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]      As will be seen, by virtue of his failure to comply with the requirements of the Northern District of New York Local Rule 7.1(a)(3) by submitting a statement specifically admitting or denying the allegations set forth in Defendants' Local Rule 7.1(a)(3) Statement, (Dkt. No. 41-6), as part of his opposition to defendants' motion, plaintiff is deemed to have admitted the facts set forth therein.  *See* pp.9 - 12, *post*.

participates in that Program Committee.  *Id.*  The functions of the Program Committee include development of a program and work plan for each inmate both to assist the inmate to address priority program needs and to help meet the demands vital to operation of the facility.  *Id.* at ¶ 4. Program assignments are made pursuant to DOCCS Directive No. 4401, entitled "Guidance and Counseling Services".  *See* Kerwin Aff. (Dkt. No. 41-2) Exh. D.  In plaintiff's case, available work and program assignments were limited based upon his refusal to participate in the Alcohol and Substance Abuse Treatment ("ASAT") program, and additionally based upon the prior issuance of two misbehavior reports for lewd exposure, making him unsuitable for participation in certain programs.  Bailey Decl. (Dkt. No. 41-4) ¶ 10.

In November of 2008, plaintiff met with defendant Mardon to discuss programming options available to him.  Amended Complaint (Dkt. No. 5) ¶ 16.  Defendant Mardon asked plaintiff to choose between cleaning the hallways or working in the mess hall, and warned him that his refusal to select one of those two options could result in disciplinary action.  Amended Complaint (Dkt. No. 5) at ¶ 16.  When Williams responded that he had no preference, he was placed on mess hall duty. *Id.*  During that conversation plaintiff claimed that he had a medical

excuse exempting him from working in a position that required him to stand for long periods of time.[3]  *Id.*

While the precise chronology is not laid out in his amended complaint, plaintiff's job duties while at Coxsackie are summarized in a printout presented as an exhibit in connection with his opposition papers. *See* Williams Aff. (Dkt. No. 47-4) Exhs. at pp. 7-8 out of 54.  According to that document Williams was not placed in a work position at Coxsackie until December 15, 2008, when he was assigned to work in the prison dining hall.  *Id.*  Williams was removed from that position on July 5, 2009, after receiving a medical restriction on or about June 26, 2009, excusing him from working in a program that required prolonged standing.  Mardon Decl. (Dkt. No. 41-5) ¶¶ 5-6; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 41-6) ¶¶ 6-7.

Following his removal from the food services position plaintiff remained unassigned until September 2009, when, after meeting with defendant Mardon, he was scheduled to be assigned to work on a utility

---

[3]       Prior to his transfer into Coxsackie plaintiff was treated by DOCCS medical personnel for various medical conditions some of which stem from a hairline fracture to his left ankle and the resulting tearing of the surrounding ligaments. Amended Complaint (Dkt. No. 5) ¶ 27. The residual effects of that injury experienced by Williams include chronic knee and hip pain caused by weight redistribution.  *Id.* Due to that injury, plaintiff is now required to wear a knee brace.  *Id.*

crew, a position which he previously held at the Eastern Correctional Facility while under a similar medical restriction.  Mardon Decl. (Dkt. No. 41-5) ¶ 7; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 41-6) ¶ 8; *see also* Williams Aff. (Dkt. No. 47-4) Exhs. at p. 7out of 54.  Plaintiff never actually entered the utility crew program, however, because of an intervening assignment, beginning on September 28, 2009, to a position within Industry manufacturing socks.  *See* Amended Complaint (Dkt. No. 5) ¶ 16.  Mardon Decl. (Dkt. No. 41-5) ¶ 8; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 41-6) ¶ 9-10; Williams Aff. (Dkt. No. 47-4) Exhs. at p. 7 out of 54; Amended Complaint (Dkt. No. 5) ¶ 16.  It appears from the relevant records that plaintiff worked in that position until his removal for disciplinary reasons on August 29, 2010, followed by a period of disciplinary Special Housing Unit ("SHU") confinement through October 2010 and his subsequent transfer into the Upstate Correctional Facility.[4]

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on June 4, 2009 and, at the direction of the court, submitted an amended complaint, which was filed

---

[4]      Upstate is a maximum security prison comprised exclusively of special SHU cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day.  *See Samuels v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

on August 26, 2009.  Dkt. Nos. 1, 5.  As defendants, plaintiff's amended

complaint named Lori Mardon, identified by plaintiff as Corrections

Counselor/Program Supervisor at Coxsackie; Mary Bailey, identified as a

Corrections Counselor Supervisor; Daniel Martuscello, the Deputy

Superintendent for Security at Coxsackie; David Hallenbeck, the Deputy

Superintendent for Programs at the facility; Brad Schwebler, a Corrections

Counselor at Coxsackie; Kenneth S. Perlman, the DOCCS Deputy

Commissioner of Corrections and Program Services; and Dr. Albert

Paolano, a prison physician employed at the facility.  *See* Dkt. No. 5.  In

his complaint plaintiff alleged that defendants' actions deprived him of due

process and equal protection and constituted cruel and unusual

punishment, in violation of the Fourteenth and Eighth Amendments,

respectively.  *Id.* at ¶¶ 27-31.  As relief, plaintiff's complaint sought

declaratory, injunctive, and monetary relief.  *Id.* at  ¶¶ 32-34.

        In response to plaintiff's complaint, on January 20, 2010

defendants moved to dismiss his claims pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure for failure to state a cause of action upon

which relief may be granted.  Dkt. No. 14.  That motion resulted in my

issuance of a report on September 3, 2010, recommending that all of

plaintiff's claims be dismissed, with leave to replead, with the exception of

his claim that defendants Mardon and Bailey denied him equal protection based upon his allegation that they chose not to place him in alternative programming due to the scars on his face.  Dkt. No. 21.  That report and recommendation was adopted by decision and order issued by District Judge David N. Hurd on September 27, 2010.  Dkt. No. 23.

On July 14, 2011, following the joinder of issue and completion of pretrial discovery, the remaining two defendants moved for the entry of summary judgment dismissing plaintiff's remaining claims.  Dkt. No. 41. In their motion, defendants argue that plaintiff's claims are procedurally barred based upon his failure to file and pursue to completion a grievance regarding programming pursuant to the DOCCS inmate grievance program ("IGP").  Defendants argue further that, in any event, plaintiff's remaining equal protection claim lacks merit, as a matter of law.  *Id.* Plaintiff has since responded in opposition to defendants' motion.  Dkt. No. 47.

Defendants' motion, which is now fully briefed, is ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.    <u>DISCUSSION</u>

8

A.   Plaintiff's Failure to Properly Respond to Defendants' Local
Rule 7.1(a)(3) Statement

Before turning to the merits of plaintiff's claims and defendants'

motion, I must first address the adequacy of plaintiff's opposition papers.

In their motion, as required by Northern District of New York Local Rule

7.1(a)(3), defendants submitted a statement of material facts as to which,

they contend, no genuine issues exist.  *See* Dkt. No. 41-6.  While in his

opposition papers Williams has also submitted what he designates as a

Local Rule 7.1(a)(3) Statement, *see* Dkt. No. 47-1, that statement sets

forth sixteen paragraphs containing statements of asserted facts which do

not  correlate to defendants' statement and, significantly, give no

indication of whether the statements within Defendants' Local Rule

7.1(a)(3) Statement are admitted or denied, as required by the rule.  *See*

N.D.N.Y.L.R. 7.1(a)(3); *see also Steptoe v. City of Syracuse*, No. 5:09-

CV-1132, 2010 WL 5174998, at *5 (N.D.N.Y. Oct. 5, 2010) (Peebles,

M.J.), *report and recommendation adopted*, 2010 WL 5185809 (N.D.N.Y.

Dec. 15, 2010).

In addition to his obvious awareness of the local rule, based upon

his submission of an opposing Local Rule 7.1(a)(2) Statement, plaintiff

received a reminder concerning the rule's requirements in the form of

defendants' inclusion with their motion papers of the court's "Notification

of the Consequences of Failing to Respond to a Summary Judgment

Motion", pointedly informing Williams of the need to file a proper

responsive Local Rule 7.1(a)(3) Statement identifying genuine issues of

fact claimed by him to be in dispute and advising him that absent such a

statement the material facts set forth in the defendants' statement will be

deemed admitted.  *See* Dkt. No. 41-1.  Despite that admonition, while

Williams did submit a Local Rule 7.1(a)(3) Statement in connection with

his opposition to defendants' motion, that statement contains only

assertions of fact and does not either respond specifically to the facts set

forth in Defendants' Local Rule 7.1(a)(3) Statement or identify genuine

disputes of material fact requiring trial before the merits of plaintiff's claims

can be adjudicated.

Local Rule 7.1(a)(3) is explicit in addressing the consequences of a

failure to properly address a moving party's Local Rule 7.1(a)(3)

Statement, providing that "[t]he Court shall deem admitted any facts set

forth in the Statement of Material Facts that the opposing party does not

specifically controvert."  N.D.N.Y.L.R. 7.1(a)(3).   This is a provision which,

like its predecessors, including former Northern District of New York Local

Rule 7.1(f), has been uniformly enforced, resulting in facts set forth in a

moving party's statement being deemed to have been admitted upon an opposing party's failure to properly respond.  *See, e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[5]

Although in this instance the result of plaintiff's failure is not particularly significant, since the statements set forth in Defendants' Local Rule 7.1(a)(3) Statement find little, if any, contradiction from within plaintiff's amended complaint and opposing papers, I nonetheless recommend that the facts set forth in Defendants' Local Rule 7.1(a)(3) Statement be deemed to have been admitted by the plaintiff by virtue of his failure to properly respond in opposition to that statement.

### B.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as

---

[5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*,

477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled

to special latitude when defending against summary judgment motions,

they must establish more than mere "metaphysical doubt as to the

material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith

Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court

to consider whether *pro se* plaintiff understood nature of summary

judgment process).

        When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences from the facts, in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.

Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is

warranted only in the event of a finding that no reasonable trier of fact

could rule in favor of the non-moving party.  *See Building Trades

Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002)

(citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one

reasonable conclusion as to the verdict").

                C.    Merits of Plaintiff's Remaining Equal Protection Claim

        The essence of plaintiff's remaining claim is that defendants

13

Mardon and Bailey violated his Fourteenth Amendment right to equal protection by refusing his request for specific programming, while at the same time granting other inmate requests for those programs. Plaintiff contends that he was told by those defendants that they did not want him in any other programming because he had too many scars on his face. Amended Complaint (Dkt. No. 5) ¶ 25.

The Equal Protection Clause of the Fourteenth Amendment directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia*, *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S. Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225, 121 S.Ct. 1475

14

(2001) (internal quotation marks omitted)).

In this instance, the defendants have addressed plaintiff's allegations by offering legitimate, non-discriminatory reasons for their various programming decisions with respect to the plaintiff while at Coxsackie.  Defendant Mardon, a member of the Coxsackie Programming Committee, states that plaintiff was assigned to work in food services until his removal due to a written medical restriction, and that he was thereafter placed into an Industry position, one which according to the plaintiff he sought from the outset.  Mardon Decl. (Dkt. No. 41-5) ¶¶ 5-8; Amended Complaint (Dkt. No. 5) ¶ 16.  Programming decisions related to the plaintiff were made in accordance with the requirements of DOCCS Directive No. 4401 and consistent with priority program needs of plaintiff as well as the requirements for operating a prison facility.  Mardon Decl. (Dkt. No. 41-5) ¶¶ 4, 10.  Defendants deny that any programming decisions in plaintiff's case were based upon his physical appearance.  *Id.* at ¶ 9; Bailey Decl. (Dkt. No. 41-4) ¶ 11.  According to defendant Bailey, plaintiff was ineligible for participation in certain programs because of his refusal to participate in an ASAT program and his receipt of misbehavior reports for lewd exposure.  Bailey Decl. (Dkt. No. 41-4) ¶ 10.

It is true that the defendants have offered no explanation as to why

15

plaintiff was not placed into the desired Industry position in or after November 2008, when first requested.  It is well established, however, that prison inmates do not enjoy a right to programming of their choice, and that absent denial for a constitutionally or statutorily prohibited basis, prison officials enjoy broad discretion in assigning inmates to programming and work assignment.  *See Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009); *Thompson v. LaClair*, No. 9:08-CV-0037, 2009 WL 2762164, at *1, *6 (S.D.N.Y.Aug. 25, 2009) (Scullin, S.J. and Peebles, M.J.).  Despite the comprehensive record now before the court plaintiff has been unable to point to any evidence suggesting that his programming while at Coxsackie, including the decision to place him a food services work position, was based upon any protected criteria or lacked a rational basis.  Having carefully reviewed the record now before the court, I conclude that no reasonable factfinder could determine that the plaintiff's right to equal protection, as guaranteed under the Fourteenth Amendment, was violated by defendants' programming decision.

IV.   SUMMARY AND RECOMMENDATION

        The remaining equal protection claim in this action centers upon plaintiff's contention that he should not have been placed in a food service position at Coxsackie in or about December 2008, and instead should

have been offered a position either with Industry or as a teacher's aide.

The record now before the court lacks any evidence that the defendants'

decisions regarding plaintiff's programming were motivated by a prohibited

classification or lacked a rational basis.  Defendants are therefore entitled

to summary judgment dismissing plaintiff's remaining equal protection

claim as a matter of law.[6]  It is therefore hereby respectfully,

RECOMMENDED, that defendants' motion for summary judgment

(Dkt. No. 41) dismissing plaintiff's remaining claims be GRANTED, and

that plaintiff's complaint in this action be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

---

[6]        In light of my recommendation on the merits I have not addressed defendants' alternative argument that, by virtue of his failure to exhaust available administrative remedies, Williams is precluded from bringing this action.  While it is clear from the submissions now before the court that plaintiff did not file a grievance concerning his programming and pursue it through the entire IGP to a determination by the Central Office Review Committee ("CORC"), plaintiffs allegations regarding what he was told about the grievability of programming decisions would, at a minimum, require careful analysis to determine whether he had established a basis for excusing the grievance requirement under the Second Circuit's controlling case law.  *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:        February 16, 2012
              Syracuse, NY



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

**\*1** Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia*, his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?*, SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> [FN5.] While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> [FN6.] The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurre," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally-based and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). See *Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. See Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. See Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled 'Awake.'" Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.](#) The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.](#) There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See* [*Flanagan,* 2002 WL 122921, at \*2](#). The transfer to a special housing unit potentially implicates due process concerns. *See, e.g.,* [*Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002)](#) (noting that in the Second Circuit, confinement in a special

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

**a. Witnesses**

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

#### b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility." ' *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

#### c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

e. Timeliness of the Hearing

*14 Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g.,* Poe v. Leonard, 282 F.3d 123, 140 (2d Cir.2002); Emblen v. Port Auth. of New York/New Jersey, 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g.,* Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." Colon, 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

**3. Paul Cecilia**

Defendants concede Paul Cecilia's personal involvement.

**4. Javier Irurre**

Defendants concede Javier Irurre's personal involvement.

**5. Sergeant Schwartzman**

Defendants concede Sergeant Schwartzman's personal involvement.

**6. Dennis Bliden**

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

**7. Jeffery McKoy**

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

**8. Christopher P. Artuz**

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

**E. Qualified Immunity**

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability to civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 5174998 (N.D.N.Y.)

(Cite as: 2010 WL 5174998 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
LeChristian STEPTOE, Plaintiff,
v.
The CITY OF SYRACUSE and the Genesee Grande
Hotel, Defendants.
Civil Action No. 5:09-CV-1132 (NPM/DEP).

Oct. 5, 2010.

LeChristian Steptoe, Syracuse NY, pro se.

City of Syracuse Law Department, Joseph Doyle, Esq. of
Counsel, Syracuse, NY, for Defendant City of Syracuse.

Costello, Cooney Law Firm, Robert Connolly, Esq., Paul
Ferrara, Esq., of Counsel, Syracuse, NY, for Defendant
the Genesee Grande Hotel.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro Se* plaintiff LeChristian Steptoe has
commenced this action against defendants City of
Syracuse ("City") and The Genesee Grande Hotel
("Hotel") pursuant to 42 U.S.C. § 1983, alleging that the
defendants deprived him of his civil rights as guaranteed
under the Fourth and Fourteenth Amendments to the
United States Constitution, and additionally asserting
pendent state law claims of negligence and intentional
infliction of emotional distress. Plaintiff's claims stem
from an arrest for criminal trespass based upon his
presence on the defendant Hotel's premises, a charge
which was later dismissed by a local court. As relief,
plaintiff's complaint seeks recovery of $30 million from
defendant City and $20 million from the defendant Hotel.

Although procedurally the case is in its formative
stages and no meaningful pretrial discovery has yet
occurred, plaintiff has now moved for summary judgment
in his favor. While the motion appears to be centered upon

the question of whether the alleged civil rights
deprivations were effectuated under color of state law, in
his motion plaintiff claims entitlement to summary
judgment in his favor on all claims as against defendant
Hotel. Because I find that the motion is premature, and in
any event plaintiff has failed to carry his initial burden of
demonstrating the lack of any triable issue of material fact
relating to his claims against the Hotel, I recommend that
his motion be denied.

*I. BACKGROUND*[FN1]

FN1. In light of the procedural posture of the
case the following recitation is derived from the
record now before the court with all inferences
drawn and ambiguities resolved in favor of the
defendants. *Terry v. Ashcroft,* 336 F.3d 128,
137 (2d Cir.2003).

Plaintiff is and was at the relevant times a resident of
Syracuse, New York. Amended Complaint (Dkt. No. 7) ¶
1. The Genesee Grande Hotel is a place of public
accommodation located in Syracuse, New York, offering
hotel, dining, and bar services. *Id.* at ¶¶ 2, 4-6. Steptoe has
never been an overnight guest at the Hotel. Ferrara Aff.
(Dkt. No. 32) Exhs. M, N. Plaintiff has, however, eaten in
the Hotel's restaurant at various times. Amended
Complaint (Dkt. No. 7) ¶¶ 4-8; Plaintiff's Exhibits (Dkt.
No. 22) Exh. 7; Plaintiff's Reply Exhibits (Dkt. No. 40)
Exh. 3.

Prior to September 22, 2009, the evening in question,
Hotel employees had occasionally seen Steptoe in the
Hotel during odd, late-night hours. One such instance
occurred at approximately 3:30 a.m. on a morning when
the plaintiff approached Kelly Whitney, a guest services
agent and the night-time auditor working at the facility,
seeking information regarding hotel services. Plaintiff's
Exhibits (Dkt. No. 22) Exh. 1. After a brief conversation,
during which Ms. Whitney ascertained that Steptoe was
not a guest at the Hotel, plaintiff left. *Id.* Plaintiff returned,
however, approximately two weeks later at about 1:00
a.m., again asking about hotel services despite not being

Slip Copy, 2010 WL 5174998 (N.D.N.Y.)

(Cite as: 2010 WL 5174998 (N.D.N.Y.))

a guest at the Hotel. *Id.* On yet another date plaintiff was observed by a different Hotel employee, Joanna Ramsey, as he approached the front desk of the Hotel at approximately 12:30 a.m., yet again inquiring about hotel services. Plaintiff's Exhibits (Dkt. No. 22) Exh. 1. On that occasion security was called, and plaintiff was directed to leave the property. *Id.* Based upon these incidents plaintiff was advised by both Hotel staff and security not to enter the premises. Plaintiff's Exhibits (Dkt. No. 22) Exh. 1.

**\*2** On the evening of September 22, 2009 plaintiff entered the Hotel through a side entrance. *Id.* The door through which Steptoe gained access to the facility leads to a dining patio that is enclosed by a metal fence. *Id.* at Exh. 2; *see also* Plaintiff's Exhibits (Dkt. No. 22) Exh. 13. After observing the plaintiff enter the Hotel and walk through the main level by means of security cameras, Ms. Whitney notified Pam Otis, an off-duty Syracuse City Police Officer who was working a private security detail for the Hotel on that evening, of Steptoe's presence. Plaintiff's Exhibits (Dkt. No. 22) Exhs. 1, 2.

After entering the Hotel, plaintiff proceeded into the bar area where the bartender, Sherry MacCombie, was in the process of closing because of the late hour and lack of customers in the premises. MacCombie Aff. (Dkt. No. 53) ¶ 5.[FN2] After plaintiff expressed interest in purchasing alcohol Ms. MacCombie requested identification; in response to that directive, Steptoe produced a Massachusetts driver's license. *Id.* at ¶¶ 5-7; Plaintiff's Exhibits (Dkt. No. 22) Exh. 2.

> **FN2.** An earlier affidavit signed by Sherry MacCombie was filed with the court in connection with the Hotel's opposition to plaintiff's motion. *See* Dkt. No. 44. Because that affidavit contained a typographical error, suggesting that it was signed on June 17, 2008, rather than June 17, 2010, the affidavit was resubmitted, without substantive changes, after having been again signed and sworn to on August 26, 2010. *See* Dkt. Nos. 49, 53.

At that point Ms. Otis entered the bar and, upon questioning, the plaintiff told her that he was interested in purchasing drinks. MacCombie Aff. (Dkt. No. 53) ¶ 7;

Plaintiff's Exhibits (Dkt. No. 22) Exh. 2. Ms. Otis then advised the plaintiff that if he was there to have a drink he was welcome to stay, but if not he was trespassing and would have to leave. MacCombie Aff. (Dkt. No. 53) ¶ 8.

After Ms. Otis left the bar area, Steptoe requested a shot of whiskey from bartender MacCombie. MacCombie Aff. (Dkt. No. 53) ¶ 9. When informed that it was the Hotel's policy not to sell shots of alcohol, as evidenced by a sign posted above the cash register in the bar area, plaintiff next inquired concerning the price of a beer; upon being advised that it would cost him $4.50 for a beer, Steptoe left without ordering any drinks. *Id.* Plaintiff then exited the Hotel, but returned a short time later at approximately 11:45 p.m. on the same evening and approached the front desk, complaining to Ms. Whitney regarding the incident. Plaintiff's Exhibits (Dkt. No. 22) Exhs. 1, 2. Ms. Otis was summoned to the lobby area, although by the time she arrived plaintiff had already left the premises. *Id.* at Exh. 2. Upon investigating the matter, Officer Otis learned from Joanna Ramsey, another Hotel employee, that she too had seen and spoken with Steptoe concerning his presence on Hotel property on a prior occasion, and that at that time plaintiff was informed by Hotel security personnel to leave and not return to the premises.

Officer Otis filed a report regarding the incident and lodged a violation information with the Syracuse City Court on September 23, 2009 accusing plaintiff of trespass, in violation of New York Penal Law § 140.05. Plaintiff's Exhibits (Dkt. No. 22) Exhs. 2, 3. A warrant for Steptoe's arrest was thereafter sought and obtained. Amended Complaint (Dkt. No. 7) ¶¶ 55-56. Steptoe was subsequently arrested at 9:00 a.m. on October 2, 2009 by Syracuse Police Officer Nolan, and appeared in court concerning the matter an hour later, at which time he was released on his own recognizance.[FN3] Plaintiff's Exhibits (Dkt. No. 22) Exh. 6; *see also* Amended Complaint (Dkt. No. 7) ¶ 89. The charge against plaintiff was ultimately dismissed by Syracuse City Court Judge Kate Rosenthal on December 15, 2009. Plaintiff's Exhibits (Dkt. No. 22) Exh. 8.

> **FN3.** The parties' recitations of the chronology of events surrounding plaintiff's arrest and ensuing

Slip Copy, 2010 WL 5174998 (N.D.N.Y.)

(Cite as: 2010 WL 5174998 (N.D.N.Y.))

court appearance are conflicting. Plaintiff maintains that he was detained for nearly thirty hours before being brought before a judge. Amended Complaint (Dkt. No. 7) ¶¶ 78, 89. Plaintiff's version, however, is seemingly contradicted by the arrest report filed by Police Officer Nolan. Plaintiff's Exhibits (Dkt. No. 22) Exh. 6.

## II. *PROCEDURAL HISTORY*

**\*3** Plaintiff commenced this action on October 8, 2009 and, at the direction of the court, subsequently filed an amended complaint on December 21, 2009. Dkt. Nos. 1, 7. Named as defendants in plaintiff's amended complaint are the City of Syracuse and The Genesee Grande Hotel. *Id.* In his complaint, as amended, plaintiff asserts constitutional claims under the Fourth Amendment for unlawful seizure of his identification and false arrest, as well as the Fourteenth Amendment for the denial of equal protection and due process, and additionally interposes pendent state law claims of negligence and intentional infliction of emotional distress. *Id.* Defendants have since answered, generally denying plaintiff's material allegations and asserting various affirmative defenses.[FN4] Dkt. No. 11, 13.

> FN4. According to counsel for defendant Hotel, plaintiff served a second amended complaint on June 8, 2010. Ferrara Aff. (Dkt. No. 32) ¶ 21 and Exh. K. There is no reference to that pleading on the court's docket. In any event, since that amended complaint was not served with leave of court, as required under Rule 15(a) of the Federal Rules of Civil Procedure, the court has disregarded its purported existence and will treat plaintiff's amended complaint, filed on December 21, 2009, as the currently-operative pleading. *See* Dkt. No. 7.

Following joinder of issue, a Rule 16 scheduling conference with the court, and the issuance of a case management scheduling order, but before any significant pretrial discovery had occurred in the case, plaintiff moved on June 2, 2010 for partial summary judgment. Although the precise scope of the relief sought in his motion is somewhat difficult to discern, it appears that

plaintiff's motion is focused upon whether, given the role played by off-duty Syracuse Police Officer Pam Otis in the relevant events, the Hotel can properly be viewed as a state actor for purposes of his claims under 42 U.S.C. § 1983. Dkt. No. 22. The defendants have since responded in opposition to plaintiff's motion. Dkt. Nos. 32-35, 39, 44, 53. In their opposition papers both defendants argue that the motion is premature, given that pretrial discovery has not yet fully occurred. *Id.* Additionally, the defendant Hotel argues that in any event the motion lacks merit. *Id.* Plaintiff has since submitted additional reply papers in answer to the defendants' oppositions. Dkt. No. 40.

Plaintiff's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(b). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Rule 56(f) Objection*

In their opposition papers both defendants assert that Steptoe's summary judgment motion is premature in light of the procedural posture of the case. In support of that position defendants note that mandatory disclosure has not yet been exchanged pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, nor have they had an opportunity to serve interrogatories and other discovery demands and take plaintiff's deposition concerning the relevant events.

While neither defendant makes specific reference to the rule, their argument is addressed to Rule 56(f) of the Federal Rules of Civil Procedure. That rule provides, in pertinent part, that

[i]f a party opposing the [summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

  **\*4** (1) deny the motion;

  (2) order a continuance to enable affidavits to be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5174998 (N.D.N.Y.)

(Cite as: 2010 WL 5174998 (N.D.N.Y.))

obtained, depositions to be taken, or other discovery to be undertaken; or

(3) issue any other just order.

Fed.R.Civ.P. 56(f). As can be seen from the text of the rule itself, Rule 56(f) provides a narrow exception to the availability of summary judgment in instances where a party simply cannot fairly respond to a summary judgment motion because of the inability, through no fault of the opposing party, to acquire evidence which is available and would preclude the entry of summary judgment. See *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.,* 769 F.2d 919, 925-27 (2d Cir.1985); *Crystalline H₂O, Inc. v. Orminski,* 105 F.Supp.2d 3, 6-9 (N.D.N.Y.2000) (McAvoy, J.). In order to successfully assert a Rule 56(f) defense to a summary judgment motion a litigant must provide specific indication, in affidavit form, of the evidence sought, its relevance to the issues underlying the motion, the efforts that were made to obtain that evidence, and why those efforts have been unsuccessful. *Hudson River Sloop Clearwater, Inc. v. Department of Navy,* 891 F.2d 414, 422 (2d Cir.1989) (citing *Burlington,* 769 F.2d at 926-27); *Young v. Corbin,* 889 F.Supp. 582, 584-85 (N.D.N.Y.1995) (McAvoy, C.J.).

The opposition papers offered by the City fail to meet the Rule 56(f) requirements, which are exceedingly rigorous and specific. The attorney affidavit submitted on behalf of the defendant Hotel, however, does since it details the discovery sought, which is uniquely within plaintiff's knowledge.

A question remains as to whether the information that has yet to be developed, including through plaintiff's deposition, is critical to adjudication of the pending motion. Most certainly the issue of state action is dependent upon the inter-relationship between the defendant Hotel and defendant City and its personnel, including Pam Otis. Defendants have identified nothing that could be developed through deposing the plaintiff that would bear upon this issue.

Although this is less than clear, it appears that plaintiff's motion goes beyond merely addressing the question of state action, additionally requesting summary judgment on his section 1983 claims against the defendant Hotel. Those claims are heavily dependent upon critical facts upon which the parties' versions differ markedly. Accordingly, the court agrees that it would be unfair to adjudicate the merits of plaintiff's claims without first affording defendants a reasonable opportunity to engage in pretrial discovery, including to take plaintiff's deposition. I therefore recommend that plaintiff's motion be denied as premature under Rule 56(f) of the Federal Rules of Civil Procedure. See *Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97-98 (2d Cir.2000).

B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

**\*5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5174998 (N.D.N.Y.)

(Cite as: 2010 WL 5174998 (N.D.N.Y.))

*se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Significance of Defendants' Failure To Respond To Plaintiff's Local Rule 7.1(a)(3) Statement*

Although no reference is made to the rule, plaintiff's summary judgment motion is supported by a statement of undisputed material facts, as required under Northern District of New York Local Rule 7.1(a)(3). In its opposing papers, the defendant Hotel has failed to respond to Plaintiff's Local Rule 7.1(a)(3) Statement.

Ordinarily, this failure would result in the facts set forth in plaintiff's statement being deemed admitted by defendant Hotel, for purposes of the pending motion, based upon its failure to properly respond to the statement. *See Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[FN5] In this instance, however, plaintiff himself has also failed to comply with the requirements of Local Rule 7.1(a)(3), in that his statement fails to provide citations to the record corresponding to certain of the facts

set forth therein, as required by the rule. I therefore recommend that plaintiff's Local Rule 7.1(a)(3) Statement, as well as defendant Hotel's failure to respond to that statement, be disregarded for purposes of the pending motion.

> FN5. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

D. *Merits of Plaintiff's Motion*

*6 As has been noted, plaintiff is somewhat vague when it comes to the relief now sought. In his motion papers, which are exceedingly prolix, plaintiff begins by requesting that the affirmative defenses set forth by both defendants "be denied". *See* Notice of Motion (Dkt. No. 22) ¶ 1. In its closing passages, however, the document denominated as plaintiff's notice of motion requests partial summary judgment against the defendant Hotel with regard to his claims asserted under 42 U.S.C. § 1983, alleging that false statements were made for the purpose of procuring his arrest and prosecution without probable case.[FN6] *Id.*

> FN6. That summary judgment is sought only against defendant Hotel is confirmed by plaintiff's reply, in which he argues that the City lacks standing to oppose the motion. Plaintiff's Reply Aff. (Dkt. No. 40) ¶¶ 216-25.

As a threshold matter, to establish entitlement to summary judgment on his section 1983 claims arising out of his arrest, plaintiff must show that based upon the record now before the court, interpreted in a light most favorable to the defendants, no reasonable factfinder could conclude that there was probable cause for his arrest. *See Finigan v. Marshall,* 574 F.3d 57, 61, 62 (2d Cir.2009) (granting summary judgment in favor of the defendant in a section 1983 action based upon a finding of probable cause for arrest). As was previously noted, plaintiff was charged criminally with trespass, in violation of New York Penal Law § 140.05. That section provides that "[a] person is guilty of trespassing when he [or she] knowingly enters or remains unlawfully in or upon premises." N.Y.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5174998 (N.D.N.Y.)

(Cite as: 2010 WL 5174998 (N.D.N.Y.))

Penal Law § 140.05. A violation of this statute occurs when a person has been asked to leave and not return to a premises, including a place of public accommodation such as a hotel, and nonetheless enters or remains upon premises in defiance of such a directive and without permission. *People v. Bembry,* 128 Misc.2d 243, 490 N.Y.S.2d 431 (Utica City Ct.1985).

In this instance the record before the court, when viewed in light most favorable to the defendants, reflects that plaintiff was advised on more than one occasion by Hotel employees and security staff not to return to the premises if he was not there to make a purchase, and that directive was reiterated by Pam Otis on the evening of September 22, 2009. Despite those instructions, after initially exiting the premises, plaintiff returned to the Hotel on that evening in defiance of the order not to do so. Accordingly, plaintiff is unable to establish a lack of probable cause for his arrest for criminal trespass in violation of Penal Law § 140.05.

In addition to being unable to show, as a matter of law, that his arrest and prosecution was without probable cause, plaintiff similarly cannot establish no reasonable factfinder could conclude that defendant Hotel was not acting under color of state law at the relevant times. Section 1983 provides a right of action against a party "who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, or immunities secured by the Constitution and Laws...." 42 U.S.C. § 1983. One of the essential elements of a claim under that section is that the conduct complained of was committed by a person acting under color of state law. *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994); *Claudio v. Sawyer,* 675 F.Supp.2d 403, 407-408 (S.D.N.Y.2009).

**\*7** To establish liability under section 1983, a plaintiff must prove unlawful conduct which is "fairly attributable to the state." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Dyno v. Binghamton,* No. 3:09-CV-313 (TJM/DEP), 2009 WL 1663990, \* 8 (N.D.N.Y. June 15, 2009) (McAvoy, S.D.J.). Actions of a private entity such as the Hotel can

be deemed fairly attributable to the state when:

(1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate", or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate", ("the public function test").

*Sybalski v. Independent Group Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008) (citing and quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001)) (citations and internal quotation marks omitted); *see also Hollander v. Copacabana Nightclub,* No. 08-5547-CV, 2010 WL 3419954, \* 3 (2d Cir. Sept.1, 2010); *Fabrikant v. French,* No. 1:03-CV-1289 (DNH-DRH), 2010 WL 2774043, at \*5 (N.D.N.Y. July 13, 2010) (Hurd, D.J.).

In this case, the plaintiff appears to suggest application of the "joint action test", asserting that the defendant Hotel and a state official, in this case Pam Otis, shared a common unlawful goal, agreeing to act together jointly to deprive him of rights guaranteed by federal law.[FN7] The facts surrounding the interactions between employees of the defendant Hotel and public officials, including officers with the Syracuse Police Department, are far from crystalized. It is true that representatives of the Hotel requested that plaintiff be prosecuted for trespass. This alone, however, does not constitute sufficient joint action between representatives of the Hotel, as a private entity, and public police officials to support a finding of liability under section 1983. *Cf. Parker v. Grand Hyatt Hotel,* 124 F.Supp.2d 79, 88 (D.D.C.2000); *Bang v. Utopia Restaurant,* 923 F.Supp. 46, 49 (S.D.N.Y.1996).

FN7. For purposes only of plaintiff's pending motion, the court has assumed that Pam Otis, an off-duty Syracuse City Police Officer, could properly be regarded as a state official. It is not altogether clear that in the end this finding will

Slip Copy, 2010 WL 5174998 (N.D.N.Y.)

(Cite as: 2010 WL 5174998 (N.D.N.Y.))

be made. The courts have frequently been called upon to determine whether off-duty police officers can properly be regarded as state actors for purposes of section 1983. *See, e.g., Pitchell, 13 F.3d at 548; Claudio,* 675 F.Supp.2d at 408-409; *Dean v. City of Buffalo,* 579 F.Supp.2d 391, 404-405 (W.D.N.Y.2008). Because Officer Otis is not a defendant in this action, and in any event plaintiff's motion is focused upon whether the defendant Hotel can be fairly characterized as a state actor, it is unnecessary to resolve the more complex issue of determining whether Pam Otis was acting in her official capacity at the relevant times. Of course, if Officer Otis was found to have been acting under color of state law at the relevant times, then defendant City could potentially be exposed to liability under *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See Claudio,* 675 F.Supp.2d at 408-409.

Of course, if the relationship between the Hotel and the police went further a reasonable factfinder could, at trial, find that there was sufficient participation by the Hotel in joint activity with the state such that one could conclude that the Hotel was acting under color of state law. On the scant record now before the court, however, and without the benefit of pretrial discovery, the court is unable to say, as a matter of law, that no reasonable factfinder could conclude otherwise. All that is now before the court regarding this issue are plaintiff's bare, conclusory allegations that the Hotel and its employees instructed Pam Otis and other Syracuse Police Officers to violate his constitutional rights. *See, e.g.* Plaintiff's Notice of Motion (Dkt. No. 22) ¶¶ 57-58. Again, interpreted in a light most favorable to the defendants, all that can be said with certainty is that Hotel employee Kelly Whitney provided a statement to police officers regarding plaintiff's actions and requested that he be prosecuted for trespassing. This act alone is insufficient to establish an agreement to violate plaintiff's constitutional rights and convert purely private actions of a hotel employee into state action. *Bang,* 923 F.Supp. at 49 ("Calling the police, alone, does not establish joint action ....") (citing *Newman v. Bloomingdale's,* 543 F.Supp. 1029, 1032 (S.D.N.Y.1982)).

**\*8** From the foregoing, it is clear that plaintiff has failed to establish the lack of any disputed facts surrounding his claim that defendant Hotel is a state actor, and that no reasonable factfinder could conclude that Hotel and state officials did not reach an agreement or understanding to deprive the plaintiff of his constitutional rights.[FN8] Accordingly, plaintiff's motion should be denied.

> FN8. Plaintiff devotes a significant portion of his motion papers to the claim that by working as a part-time security guard for defendant Hotel while in the employ of the Syracuse City Police Department, Pam Otis has violated state laws and regulations. *See, e.g.,* Notice of Motion (Dkt. No. 22) ¶¶ 60-75. As plaintiff appears to recognize in his reply papers, *see* Plaintiff's Reply (Dkt. No. 42) ¶ 3, his allegations regarding the alleged impropriety of Officer Otis accepting outside employment with a private security detail are not relevant to the issue of whether the defendant Hotel is properly considered to have been a state actor at the relevant times.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff, who bears the burden of establishing that the defendant Hotel acted under color of state law for purposes of his claims against that entity under 42 U.S.C. § 1983, and that no triable issues of material fact exist regarding this question, seeks the entry of summary judgment arguing that no reasonable factfinder could conclude that the Hotel was not engaged in joint activity with the state and therefore could fairly be said to be a state actor. Because plaintiff's motion is premature, having been made before the defendants have had a fair opportunity to engage in pretrial discovery, it should be denied on this procedural basis. In any event, plaintiff has failed to carry his initial burden of demonstrating to the court's satisfaction the lack of any genuinely disputed issues of fact surrounding the questions of state action, as well as whether there was probable cause to believe that plaintiff committed trespass in violation of New York Penal Law § 140.05. It is therefore hereby respectfully

RECOMMENDED that plaintiff's motion for partial summary judgment (Dkt. No. 22) be DENIED in all

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5174998 (N.D.N.Y.)

(Cite as: 2010 WL 5174998 (N.D.N.Y.))


respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

Steptoe v. City of Syracuse
Slip Copy, 2010 WL 5174998 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 5185809 (N.D.N.Y.)

(Cite as: 2010 WL 5185809 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
LeChristian STEPTOE, Plaintiff,
v.
The CITY OF SYRACUSE and the Genesee Grand Hotel, Defendants.
No. 5:09-CV-1132 (NPM/DEP).

Dec. 15, 2010.
LeChristian Steptoe, Syracuse, NY, pro se.

City of Syracuse Law Department, Joseph R.H. Doyle, Esq., of Counsel, Syracuse, NY, for defendant City of Syracuse.

Costello, Cooney & Fearon, PLLC, Robert W. Connolly, Esq., Paul G. Ferrara, Esq., of Counsel, Syracuse, NY, for Genesee Grande Hotel.

*MEMORANDUM-DECISION AND ORDER*

NEAL P. McCURN, Senior District Judge.

   *1 This is an action brought by plaintiff LeChristian Steptoe ("plaintiff") pursuant to 42 U.S.C. § 1983, alleging a violation of his civil rights by defendants City of Syracuse and The Genesee Grande Hotel ("Hotel"). Currently before the court for consideration is a Report and Recommendation ("Report-Recommendation") (Doc. No. 58) prepared on October 5, 2010 by the Honorable David E. Peebles, United States Magistrate Judge ("MJ Peebles") pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(b) of the Northern District of New York, denying as premature the motion for summary judgment filed by plaintiff. On October 20, 2010, plaintiff filed a timely objection to the Report-Recommendation. Doc. No. 59. Among other things, plaintiff argues that his summary

judgment motion proves that the Hotel is a state actor, and for this reason, summary judgment on his Section 1983 claims should be granted.

   A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Parties may raise objections to the magistrate judge's report and recommendation, but they must be "specific written" objections, and must be submitted "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed.R.Civ.P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1)(C). "Where, however, an objecting party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Caldwell v. Crosset,* 2010 WL 2346330 at * 1 (N.D . N.Y.2010) (internal quotations omitted) (*citing Farid v. Bouey,* 554 F.Supp.2d 301, 307 (N.D.N.Y.2008)).

   MJ Peebles has submitted a comprehensive and well-reasoned Report-Recommendation for the court's review. The court has considered plaintiff's objections to the Report-Recommendation and finds them unavailing, and a reiteration of his original arguments. In reviewing the Report-Recommendation for clear error, the court finds none. Accordingly, the Report-Recommendation issued by MJ Peebles is hereby approved and adopted in its entirety.

   SO ORDERED.

N.D.N.Y.,2010.

Steptoe v. City of Syracuse
Slip Copy, 2010 WL 5185809 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681etseq. ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) FN1 by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.*, 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton*,
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.*, 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. [FN2] The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators;[FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U.S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Daves v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2762164 (N.D.N.Y.)
(Cite as: 2009 WL 2762164 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Milton THOMPSON, Plaintiff,
v.
Darwin LaCLAIR, Superintendent, A. McKee,
Correctional Officer and N. Irwin, Lieutenant,
Defendants.
**No. 9:08-CV-0037 (FJS/DEP).**

Aug. 25, 2009.

Milton Thompson, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Aaron M. Baldwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*ORDER*

FREDERICK J. SCULLIN, JR., Senior District Judge.

**\*1** After carefully considering the entire file in this matter,
including Magistrate Judge Peebles' January 30, 2009
Report, Recommendation and Order, to which the parties
have not filed any objections, the Court hereby

**ORDERS** that Magistrate Judge Peebles' January 30,
2009 Report, Recommendation and Order is **ADOPTED**
in its entirety for the reasons stated therein; and the Court
further

**ORDERS** that Plaintiff's cross-motion for leave to amend
his complaint as proposed is **DENIED** as futile; and the
Court further

**ORDERS** that, if Plaintiff wishes to proceed with this
action, he must file an amended complaint within **thirty
(30) days** of the filing date of this Order; and the Court
further

**ORDERS** that, if Plaintiff does not file an amended
complaint within the required time frame, the Clerk of the
Court shall enter judgment dismissing this action without
further Order of this Court for the reasons set forth in
Magistrate Judge Peebles' Report, Recommendation and
Order; and the Court further

**ORDERS** that, if Plaintiff files an amended complaint
within the required time frame, Defendants shall file a
response to the amended complaint in compliance with the
Federal Rules of Civil Procedure and this Court's Local
Rules.

IT IS SO ORDERED.

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Milton Thompson, a New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this proceeding pursuant to 42 U.S.C. §
1983 alleging deprivation of his civil rights. In his
complaint, plaintiff asserts that he was issued a
misbehavior report accusing him of prison rule violations
which he did not commit, and that as a result of the
issuance of that report and an ensuing disciplinary hearing
he was placed in keeplock confinement and suffered the
loss of various privileges, including removal from various
prison programs. Plaintiff maintains that through their
actions defendants deprived him of procedural due process
and subjected him to cruel and unusual punishment, and
further asserts that they should be held liable for various
personal items he discovered missing at or around the time
of the hearing.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2762164 (N.D.N.Y.)
(Cite as: 2009 WL 2762164 (N.D.N.Y.))

Currently pending before the court in connection with the matter are cross-motions filed by the parties. The motion process was initiated by the defendants who, in response to plaintiff's complaint, have moved seeking its dismissal for failure to state a cause of action upon which relief may be granted. Plaintiff has since filed papers in opposition to defendants' motion and in support of a cross-motion for leave to amend his complaint to add claims, including those associated with the loss of good time credits which he attributes to the misbehavior report and disciplinary hearing. Defendants oppose plaintiff's motion for leave to amend on the ground of futility.

Having carefully considered the parties' submissions, I recommend the entry of an order granting defendants' dismissal motion, with leave to replead, and denying plaintiff's cross-motion for leave to amend on the basis of futility.

I. *BACKGROUND*[FN1]

> **FN1.** In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion, *see Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).

**\*2** Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his claims plaintiff was designated to the Franklin Correctional Facility ("Franklin"), located in Malone, New York. *See generally* Complaint (Dkt. No. 1). On August 2, 2007, while apparently already subject to cell restriction as a result of a prior disciplinary hearing, plaintiff was observed outside of his cube by Corrections Officer A. McKee. Complaint (Dkt. No. 1) § 6, ¶ 1 and Exh. 1. As a result of the incident an inmate misbehavior report was prepared by defendant McKee, charging Thompson with

violating prison rules 109.10 (being out of place) and 181.10 (failure to comply with a hearing disposition); that charge was dated August 2, 2007, and was served upon Thompson the following day. *Id.*

A Tier II hearing was convened on August 6, 2007 to address the charges set forth in the misbehavior report.[FN2] Defendant N. Irwin, a Corrections Lieutenant, served as the hearing officer during the course of that proceeding. At the close of the hearing defendant Irwin issued a decision finding plaintiff guilty on both counts, and imposing a penalty which included thirty days of keeplock confinement, with a corresponding loss of recreation, package, commissary and telephone privileges.[FN3] Complaint (Dkt. No. 1) ¶ 14 and Exh. 2. That determination was affirmed on appeal to defendant Rock, the Deputy Superintendent of Security at the facility, by decision rendered on August 14, 2007, and later by defendant LaClair, the Superintendent at Franklin, on October 16, 2007. *Id.* ¶¶ 20, 22 and Exhs. 2, 3. There is no indication in plaintiff's complaint that he appealed the hearing officer's decision to the DOCS central office.

> **FN2.** The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

> **FN3.** Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N .D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2762164 (N.D.N.Y.)
(Cite as: 2009 WL 2762164 (N.D.N.Y.))

*Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S .D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals. *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

As a direct consequence of the hearing determination, plaintiff was removed from certain programs in which he had been participating, including Alcohol and Substance Abuse Treatment ("ASAT"), Aggression Replacement Training ("ART"), and a Mobility Assistance Work Program ("MAWP"). *Id.* ¶¶ 15-17.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 10, 2008. Dkt. No. 1. Plaintiff's complaint names Superintendent LaClair, Corrections Officer McKee and Corrections Lieutenant Irwin as defendants, and asserts two causes of action, alleging deprivation of procedural due process and the imposition of cruel and unusual punishment.[FN4] *Id.*

> FN4. Defendants' motion references a third cause of action, based upon property lost or stolen from the plaintiff. *See* Defendants' Memorandum (Dkt. No. 12-2) at pp. 3, 12-13. The complaint on file with the court, however, does not appear to contain such a claim, *see* Dkt. No. 1, although the loss of properly is referenced in plaintiff's proposed amended complaint. *See* Dkt. No. 15-2, ¶¶ 28 and 33-34, and Causes of Action ¶ 2.

In response to plaintiff's complaint, defendants moved on March 27, 2008 seeking its dismissal for failure to state a cause of action upon which relief may be granted.[FN5] Dkt. No. 12. Plaintiff has since submitted responding papers in opposition to the motion and in support of a cross-motion seeking leave to amend his complaint. Dkt. No. 15. In his accompanying proposed amended complaint, plaintiff seeks to add a challenge to a determination of the facility time allowance committee ("TAC") on November 29, 2007, recommending that eighteen months and twenty days of good time credit be withheld pending plaintiff's successful completion of ASAT. Defendants have since replied in opposition to plaintiff's motion for leave to amend and in further support of their dismissal motion. Dkt. No. 16.

> FN5. Defendants' motion also seeks a stay of discovery, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, pending final disposition on the parties' cross-motions. Because I find that the interests of justice and economy would not be served by permitting the parties to engage in discovery before the dismissal motion and plaintiff's cross-motion for leave to amend are addressed, I will exercise my discretion in favor of granting that relief.

*3 The parties' cross-motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which is particularly unexacting in its requirements. Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Absent applicability of a heightened pleading requirement such as that imposed under Rule 9,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2762164 (N.D.N.Y.)
(Cite as: 2009 WL 2762164 (N.D.N.Y.))

a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007) (other quotations omitted)); *cf. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (acknowledging that a plaintiff may properly be required to illuminate a claim with some factual allegations in those contexts where amplification is necessary to establish that the claim is "plausible"). Once the claim has been stated adequately, a plaintiff may present any set of facts consistent with the allegations contained in the complaint to support his or her claim. *Twombly,* 127 S.Ct. at 1969 (observing that the Court's prior decision in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99 (1957), "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1722, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (other quotations omitted)). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974; *see also Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly* ). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator*

*Antitrust Litig.,* 502 F.3d 47, 50 (3d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974).

**\*4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

B. *Plaintiff's Procedural Due Process Claim*

In his first cause of action plaintiff asserts that his procedural due process rights were abridged during the course of the August 6, 2007 disciplinary hearing and resulting determination. While the contours of this claim are less than clearly defined, it appears plaintiff maintains that he was denied due process because defendant Irwin, the assigned hearing officer, found him guilty when, in fact, he was innocent of the charges set forth in the misbehavior report. Defendants argue that the punishment resulting from that hearing, which included thirty days of keeplock confinement in the facility's special housing unit ("SHU"), did not constitute a deprivation of a cognizable liberty interest sufficient to trigger the protections of the Fourteenth Amendment, and that in any event plaintiff's complaint does not disclose a basis upon which to conclude that he was denied due process in conjunction with any such liberty interest deprivation.

To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both 1) possessed an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2762164 (N.D.N.Y.)
(Cite as: 2009 WL 2762164 (N.D.N.Y.))

actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

*1. Deprivation of a Liberty Interest*

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that 1) the State actually created a protected liberty interest in being free from segregation; and that 2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York State has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, *see, e.g., LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.), I must find that the conditions of plaintiff's keeplock confinement as alleged did not rise to the level of an atypical and significant hardship under *Sandin* in order to recommend that defendants' motion be granted.

*5 Atypicality in a *Sandin* inquiry is normally a question of law .[FN6] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[FN7] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336; *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997); *see also Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y.2000) (citations omitted) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within

the normal range of prison custody). The essential comparison is not to the sentences of other inmates in restrictive confinement, but to periods of comparable deprivation suffered by other prisoners in the ordinary course of prison administration. *Welch v. Bartlett,* 196 F.3d 389, 393-94 (2d Cir.1999); *see also Kalwasinski v. Morse,* 201 F.3d 103, 107 (2d Cir.1999) (citing *Welch* ). This analysis should be case-specific, taking into account both the specific duration of confinement and the conditions at the prison at which it occurred. *Kalwasinski,* 201 F.3d at 107-08.

FN6. In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

FN7. While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin, see id.* at 232 n. 5, the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

In this instance, according to the plaintiff's complaint and supporting exhibits, the disputed hearing resulted in a penalty which included thirty days of keeplock confinement. In *Sandin* the Supreme Court found that segregation for such a modest duration did not impose a

Slip Copy, 2009 WL 2762164 (N.D.N.Y.)
(Cite as: 2009 WL 2762164 (N.D.N.Y.))

significant hardship on the inmate involved in that case, *see Sandin,* 515 U.S., 485-86, 115 S.Ct. at 2301, and "the decisions in the Second Circuit are unanimous that keeplock ... of thirty days or less in New York prisons is not 'atypical or significant hardship' under *Sandin.*" *Williams v. Keane,* No. 95 Civ. 0379(AJP)(JGK), 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997); *see also Anderson,* 2008 WL 3285917, at *6 (stating that "confinements in SHU or keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons") (citations omitted). Moreover, the fact that the hearing determination also included a provision for the loss of telephone, package, and commissary privileges does not suffice to establish the requisite atypicality. *Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006).

Plaintiff intimates that because of the hearing determination he was unable to participate in certain prison programs, including ASAT, ART, and the MAWP. Courts considering inmate claims regarding denial of participation in or access to prison programs or privileges under *Sandin* have uniformly concluded that inmates do not enjoy a protected liberty interest in such aspects of prison life. *See Shariff v. Artuz,* No. 99 CIV. 0321, 2000 WL 1219381, at *6 (S.D.N.Y. Aug. 28, 2000) (denial of extra privileges associated with honor block housing does not impose an "atypical and significant hardship" on plaintiffs); *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at *12 (S.D.N.Y. Oct. 15, 1999) (denial of telephone, package and commissary privileges does not impose "atypical and significant hardship"). Without denial of a cognizable liberty interest, there can be no due process violation.

2. *Due Process*

**\*6** In their motion, defendants also contend that plaintiff cannot establish a denial of the rights guaranteed under the Fourteenth Amendment, as illuminated by the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974).

While plaintiff does not appear to challenge the

procedures leading up to and associated with the hearing as not being in compliance with *Wolff,* he does assert his innocence of the charges set forth in the misbehavior report, thus implicating the requirement under the Fourteenth Amendment that the hearing officer's determination must be supported by "some evidence." *See Superintendent, Massachusetts Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 2773 (1985). Since this is a determination which cannot be made at this juncture, without reviewing the hearing record, and in light of plaintiff's failure to make a threshold showing of the deprivation of a constitutionally significant liberty interest, I have chosen not to address this second prong of defendants' dismissal motion as it relates to plaintiff's due process claim.

In sum, because plaintiff has failed to allege the deprivation of a constitutionally significant liberty interest in connection with his procedural due process claim, it is subject to dismissal.

C. *Plaintiff's Eighth Amendment Claim*

In his second cause of action, plaintiff asserts that as a result of the hearing determination he was exposed to conditions tantamount to cruel and unusual punishment, in violation of his rights under the Eighth Amendment. Defendants similarly seek dismissal of this claim.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia,* Estelle). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2762164 (N.D.N.Y.)
(Cite as: 2009 WL 2762164 (N.D.N.Y.))

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain, 103 F.Supp.2d 542, 546 (N.D.N.Y.2000)* (Kahn, J.) (citing *Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321 (1991)*); *Waldo v. Goord, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998)* (Kahn, J. and Homer, M.J.); *see also, generally, Wilson, 501 U.S. 294, 111 S.Ct. 2321.* Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837, 114 S.Ct. at 1978; Leach, 103 F.Supp.2d at 546 (citing Farmer); Waldo, 1998 WL 713809, at *2* (same).

**7** Plaintiff's complaint in this action is devoid of any allegations of exposure to conditions which would potentially support a plausible Eighth Amendment cruel and unusual punishment claim. Plaintiff merely asserts that he was subjected to keeplock confinement in an SHU for a period of thirty days, under otherwise ordinary conditions, and subjected to a concomitant loss of certain privileges and participation in prison programs. Even interpreted in a light most favorable to the plaintiff, and crediting the allegations set forth in his complaint, plaintiff has failed to allege that he experienced conditions which would suffice to establish a plausible Eighth Amendment cruel and unusual punishment claim. Accordingly, I recommend that this portion of defendants' motion be granted as well.

D. *Plaintiff's Motion For Leave To Amend*

In response to defendants' dismissal motion, plaintiff seeks leave to amend his complaint to add a challenge to the TAC's withholding of good time credits based upon his inability to complete the ASAT program due to the hearing officer's determination and resulting keeplock confinement, and additionally to recover for the loss or theft of certain of his property. Defendants assert that plaintiff's application should be rejected on the basis that it sets forth a claim which is destined for certain dismissal.

1. *Governing Standard*

Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure which provides, in pertinent part, that unless amendment as a matter of right is permitted based upon the circumstances (something which is not applicable in this action), a party may amend its pleading "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). Under Rule 15(a), leave to amend ordinarily should be freely granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. *Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962); Elma R.T. v. Landesmann Int'l Mktg. Corp., No. 98-CIV.-662, 2000 WL 297197, at *3 (S.D.N.Y. Mar. 22, 2000)* (citing *Foman* ).

Notwithstanding the familiar and well-accepted precept that leave to amend should be granted freely and is typically permitted, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion then permitting amendment would be an act of futility which should not be sanctioned. *See, e.g., Saxholm AS v. Dynal, Inc., 938 F.Supp. 120, 124 (E.D.N.Y.1996); In re Boesky Sec. Litig., 882 F.Supp. 1371, 1379 (S.D.N.Y.1995).* If, on the other hand, a proposed claim sets forth facts and circumstances which may entitle the pleader to relief, then futility is not a proper basis on which to deny the right to amend. *Saxholm, 938 F.Supp. at 124* (citing *Allstate Ins. v. Administratia Asigurarilor De Stat, 875 F.Supp. 1022, 1029 (S.D.N .Y.1995)* and *Mathon v. Marine Midland Bank, N.A., 875 F.Supp. 986, 1003 (E.D.N.Y.1995)* (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief)). In this instance defendants persuasively argue that the assertion of the additional claims set forth in plaintiff's proposed amended complaint would be futile.

2. *Lost Good Time Credits*

**8** In his proposed amended complaint, plaintiff complains of the loss of good time credits and requests,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2762164 (N.D.N.Y.)
(Cite as: 2009 WL 2762164 (N.D.N.Y.))

among the relief sought, that he be released from custody, following completion of the ASAT. The precise theory upon which this claim is predicated is not clear.

There is no indication from plaintiff's proposed amended complaint that the loss of good time credits was a *direct* result of his disciplinary hearing, and in fact the loss or recommended loss of good time credits is not a sanction authorized to be administered by a Tier II hearing officer. *See Rivera v. Coughlin,* No. 92 Civ. 3404, 1996 WL 22342, at *4-5 & n. 6 (S.D.N.Y. Jan. 22, 1996). It appears clear that the loss of good time credits was the result of a decision by the facility's TAC, and was based upon plaintiff's failure to complete the ASAT program. Since personal involvement in a constitutional deprivation is a prerequisite to a finding of liability under section 1983, and there is no allegation that any of the defendants in this case are members of TAC, the second cause of action in plaintiff's proposed amended complaint is futile. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)).

Plaintiff's theory appears to be that the loss of good time credits resulted, at least indirectly, from the hearing officer's determination, thereby elevating the resulting sanctions to a position of constitutional significance. This argument also fails, however, since as a prison inmate plaintiff does not enjoy a constitutional entitlement to participation in such programs as the ASAT. *See Thompson v. LaClair,* No. 9:08-CV-37, 2008 WL 191212, at *4 (N.D.N.Y. Jan. 22, 2008) (Scullin, S.J.) ("Inmates ... do not have a constitutional right ... to participate in prison programs.").

In sum, regardless of the precise theory on which plaintiff's second proposed cause of action is grounded, it fails to state a cause of action and his motion for leave to amend to add that claim therefore must be denied on the basis of futility. *See Brown v. Nassau County Dist. Attorney,* No. 08-CV-343, 2008 WL 4889108, at *2-3 (E.D.N.Y. Oct. 27, 2008).

3. *Plaintiff's Property Claim*

Although not specifically set out as a separate claim, plaintiff's proposed amended complaint also purports to add specific allegations regarding the loss of personal property suffered when he was transferred to the SHU for his keeplock confinement. *See* Proposed Amended Complaint (Dkt. No. 15-2) ¶¶ 11-18, 25-28, 33-34. Like his due process claim, plaintiff's property loss cause of action is futile, and destined for dismissal.

The precise theory upon which plaintiff's property loss claim is predicated is unclear. If plaintiff contends that he was denied procedural due process in connection with the property loss, that claim is subject to ready dismissal since it is well-established that New York provides an adequate post-deprivation remedy for such losses. *See Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Brooks v. Chappius,* 450 F.Supp.2d 220, 226-27 (W.D.N.Y.2006). If, on the other hand, plaintiff's claim is said to arise under state tort law, whether for conversion or otherwise, such a claim would be barred under N.Y. Correction Law § Law 24.[FN8] *See Parker v. Fogg,* No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb. 17, 1994) (McCurn, S.J.).

FN8. That section provides that

1.[n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of [the Department of Correctional Services], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of [the Department of Correctional Services] shall be brought and maintained in the court of claims as a claim against the state.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2762164 (N.D.N.Y.)
(Cite as: 2009 WL 2762164 (N.D.N.Y.))

N.Y. Correction Law § 24. It is well established, as defendants have argued, that this section, in combination with the Eleventh Amendment, precludes the assertion of pendent state law claims against corrections workers in their individual capacities, whether in state or federal court. *See Ierardi v. Sisco,* 119 F.3d 183, 186 (2d Cir.1997) (citations omitted); *Baker v. Coughlin,* 77 F.3d 12, 15-16 (2d Cir.1996); *Parker v. Fogg,* No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb. 17, 1994)* (McCurn, S.J.). I therefore recommend dismissal of plaintiff's various state law claims on this basis.

**\*9** Under the circumstances I find that the claims sought to be added through plaintiff's amended complaint are futile. I therefore recommend against the granting of plaintiff's motion for leave to amend.[FN9]

FN9. Ordinarily, the disposition of a motion for leave to amend would fall within my non-consensual jurisdiction as implicating a non-dispositive matter pursuant to 28 U.S.C. § 636(a). *Fielding v.. Tollaksen,* 510 F.3d 175, 178 (2d Cir.2007). Because of the procedural setting, however, I have chosen to format this portion of my decision as a recommendation to the assigned district judge.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's initial complaint in this matter asserts two causes of action, neither of which is facially plausible. Plaintiff's procedural due process claim is legally insufficient since the deprivation which he claims to have suffered, including thirty days of keeplock confinement with a corresponding loss of privileges and participation in prison programs, is insufficient to implicate the procedural protections offered by the Fourteenth Amendment. Similarly, plaintiff's complaint is devoid of any allegations which would establish the existence of a sufficiently serious condition potentially constituting cruel and unusual punishment in violation of the Eighth Amendment. I therefore recommend dismissal of plaintiff's complaint, with leave to replead in deference to his *pro se*

status. *See Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991).

Turning to plaintiff's proposed amended complaint, I find that the claims which plaintiff seeks to add would be futile. Plaintiff has failed to establish defendants' personal involvement in the decision to deny him good time credits. Additionally, plaintiff's property loss claims are without merit, fail to implicate a cognizable constitutional right, and if construed as arising under state law, are barred by N.Y. Correction Law § 24.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss plaintiff's complaint (Dkt. No. 12) be GRANTED, and that plaintiff's cross-motion for leave to amend (Dkt. No. 15) be DENIED, and that plaintiff's complaint be DISMISSED in all respects, with leave to replead; and it is further hereby

ORDERED that pending final determination on this report and recommendation, all discovery in this action is temporarily STAYED pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report, Recommendation and Order upon the parties in accordance with this court's local rules.

N.D.N.Y.,2009.
Thompson v. LaClair
Slip Copy, 2009 WL 2762164 (N.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2762164 (N.D.N.Y.)
(Cite as: 2009 WL 2762164 (N.D.N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.